IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
              Plaintiff,        )
                                )
         v.                     )       Criminal Action No.
                                )       14-00006-01-CR-W-HFS
ARLANDO C. STATEN,              )
                                )
              Defendant.        )

### REPORT AND RECOMMENDATION TO DENY
### DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Before the court is defendant's motion to suppress evidence
on the ground that the Terry stop was not supported by reasonable
suspicion.  I find that the stop was supported by reasonable
suspicion, that defendant's subsequent resisting and fleeing from
Officer Seever negates any Terry issue, and that defendant's
throwing the gun down while fleeing from police caused him to
relinquish any Fourth Amendment interest in that gun.  Therefore,
defendant's motion to suppress should be denied.

## I.   BACKGROUND

On October 24, 2012, police responded to reports of a
prowler in the area.  About 300 yards from the attempted
burglaries, an officer saw defendant and others getting into a
car.  Defendant matched the general description of the suspect.
When defendant saw the officer, he got back out of the car,
walked quickly back to the apartment and attempted to get back
inside.  The officer asked to speak to defendant, but he refused
to give his name and began trying to reach into his clothing, and

he initially failed to sit down on the front step when instructed by the officer.  Because of the defendant's continued "messing with" his loose clothing, his request of another man to help him out, and his attempt to stand back up, the officer decided to frisk defendant for weapons.  Defendant struggled with the officer, reached into his clothing, and made a fist around an object.  The officer released his grip on defendant, and defendant ran.  When he observed the officer chasing him with his gun drawn, defendant threw a gun down into the grass and continued running.  The gun was recovered by the pursuing officer.

On January 7, 2014, an indictment was returned charging defendant with one count of possessing a firearm after having been convicted of a felony.  Defendant filed the instant motion to suppress on July 31, 2014.  On August 20, 2014, the government filed a response, arguing that Officer Seever had reasonable suspicion, defendant committed new and distinct crimes by resisting arrest and assaulting a law enforcement officer, and defendant abandoned the firearm and denied ownership of it during his interrogation and therefore had no expectation of privacy in the firearm.

On October 30, 2014, I held an evidentiary hearing on defendant's motion to suppress.  The government appeared by Assistant United States Attorney Justin Davids.  The defendant

was present, represented by Assistant Federal Public Defender Ronna Holloman-Hughes.  The following witnesses testified:

1.  Officer Jeff Seever, Independence, Missouri, Police Department

2.  Detective Doug Miller, Independence, Missouri, Police Department

3.  Detective Steven Colbert, Independence, Missouri, Police Department

In addition, the following exhibits were admitted:

P. Ex. 1  Independence, Missouri, Police Department dispatch narrative

P. Ex. 5  <u>Miranda</u> report

P. Ex. 6  Photograph of gray jacket and back of cell phone found in vacant home (submitted in digital form due to allegation of color difference)

D. Ex. 1  Photograph of defendant

D. Ex. 2  Photograph of man who was with defendant when he was initially seen by Officer Seever

D. Ex. 3  Photograph of defendant

D. Ex. 4  Photograph of gray jacket

On October 30, 2014, defendant filed supplemental suggestions in support of his motion, arguing that the evidence presented at the hearing establishes that defendant did not meet the description given of the burglary suspect.  On November 5, 2014, the government filed a supplemental response, continuing to argue that the stop was supported by reasonable suspicion;

3

pointing out that because of defendant's new offense of resisting an officer, a new and valid basis for arrest existed and whether the initial <u>Terry</u> stop was supported by reasonable suspicion is not relevant; and again pointing out that defendant abandoned the firearm and therefore has no Fourth Amendment interest in that firearm.

## II.  EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1.   On October 24, 2012, Officer Jeff Seever was on patrol and was called to an area check along with other patrol officers after reports were received that someone was attempting to commit home burglaries in the Hawthorne housing complex (Tr. at 4–5, 7). The suspect was described as a black male with dreadlocks wearing a flat–billed hat, black jacket, white shirt and jeans (Tr. at 5, 25; P. Ex. 1).  While looking in the yard of a house, Officer Seever encountered a woman who had come out of her house across the street (Tr. at 7).  She told Officer Seever that she had seen the suspect, and she gave the same description he had been given by Dispatch (Tr. at 7).

2.   After completing a search of the area on foot, Officer Seever and the other patrol officers began searching the area in their vehicles (Tr. at 7).  As he turned a corner, Officer Seever saw two men and two women exit 436 North Kendall Road and walk to

4

a car which was in a small parking lot with just a few apartments (Tr. at 8). This was about 300 to 400 yards from the area of the attempted burglaries (Tr. at 9, 32–33). The two men had dreadlocks (Tr. at 8). One man was very tall, around 6'4", and the other man (defendant) was shorter than the first (Tr. at 8, 9). Officer Seever does not remember anything more specific about what defendant was wearing other than that he had on very loose-fitting clothing, jeans, and a dark colored jacket with a dark colored flat-billed cap (Tr. at 13, 17). Defendant was getting into the back seat of the car and turned, looking directly at the patrol car (Tr. at 8, 36). Upon seeing Officer Seever, defendant immediately exited the vehicle and began walking quickly back toward the apartment he had just exited (Tr. at 8, 33). The other man stayed by the car with the two women (Tr. at 33).

3. As defendant was walking back to the apartment, Officer Seever got out of his car and yelled, "Hey, can I talk to you for a second?" (Tr. at 8). Defendant grabbed the door knob and shouldered the door, but because the door was locked he bounced off the door (Tr. at 8). Officer Seever walked up to defendant and said, "Hey, I need to speak with you for a minute," and defendant reached for his waistband (Tr. at 9). Officer Seever told defendant to get his hands away from his waistband and sit down on the steps, that the officer needed to talk to defendant

5

for a minute (Tr. at 9).  Officer Seever asked defendant to sit down only because defendant kept trying to put his hands in his clothes, and Officer Seever could not see what defendant appeared to be reaching for (Tr. at 20, 27).  He was concerned that defendant was reaching in his clothing for a weapon (Tr. at 34).  At this point Officer Seever had no intent to arrest or search defendant (Tr. at 9, 13).  However, he had to ask defendant two or three times to sit down before defendant complied (Tr. at 9–10, 18).  At this moment, defendant was not free to leave (Tr. at 18).

    4.  Officer Seever asked for defendant's name, but defendant did not want to provide that information (Tr. at 10).  Defendant continued to "mess with" his clothing (Tr. at 10).  Officer Seever kept telling him to keep his hands away from his clothing (Tr. at 10).  Defendant turned to the taller man, sighed, and said calmly, "You really need to help me." (Tr. at 10).  Officer Seever became concerned because defendant had been reaching for his clothing and then asked for assistance from a "pretty good–sized guy" (Tr. at 10).  Officer Seever, who was the only officer on the scene at the time, requested back up (Tr. at 10, 37).

    5.  Defendant continued moving around a lot and then he began to stand up (Tr. at 10).  Officer Seever assumed defendant either had a weapon in his possession or he was intending to run,

6

or both (Tr. at 10). Officer Seever told defendant to turn around so he could be frisked for weapons (Tr. at 10). Officer Seever told defendant to put his hands on the wall; but when the officer approached defendant to perform the pat down search, defendant immediately tried to spin around and he reached for his waist band (Tr. at 10). Officer Seever grabbed defendant and tried to control his hands to keep him from reaching into his clothing (Tr. at 10). He was scuffling with defendant while trying to keep an eye on the other man (Tr. at 10-11). Officer Seever saw defendant make a fist with his hand on something, so he pushed him away and defendant ran (Tr. at 11). Officer Seever drew his weapon (Tr. at 11). He saw that defendant had a firearm in his hand and, when defendant saw Officer Seever coming, he threw the gun and ran north (Tr. at 11).

6. Officer Seever picked up the gun, a Sig Sauer P250 9 millimeter, loaded with nine rounds of ammunition in the magazine and one round in the chamber (Tr. at 11, 38). Defendant was very fast and Officer Seever could not catch up to him, so he went back to where the other three people had been waiting and saw that his partner had arrived (Tr. at 11). The other three all had outstanding warrants and were therefore arrested (Tr. at 13). When Officer Seever last saw defendant, he had circled the building and was headed in a south-southeast direction (Tr. at 12).

7

7.    The scuffle occurred about 10 to 15 feet from the stoop where defendant had been told to sit, and the gun had been thrown into the grass (Tr. at 11).  When Officer Seever recovered it, the gun was in plain view (Tr. at 12).  Officer Seever immediately informed Dispatch that the suspect had had a gun (Tr. at 12; P. Ex. 1).  This occurred at 10:51 a.m. (Tr. at 12).  Officer Seever was aware that fleeing from a law enforcement stop or arrest is a crime under Missouri law (Tr. at 12-13, 19).

8.    Officer Seever continued to attempt to locate defendant and at least once saw him crossing a street; however, because of defendant's speed, the officers were having troubling tracking him (Tr. at 13-14).  Police continued to get calls from citizens reporting that defendant was in the area, and one of those callers reported that defendant was still armed (Tr. at 14).  The suspect was described in one call as wearing a gray flannel shirt with a white shirt underneath and long dreadlocks; in another call he was described as being 17 to 19 years of age with long dreadlocks and wearing a gray hoodie (Tr. at 26, 27).  Detective Steven Colbert spoke with a man who had called police and said he had seen police in the neighborhood looking for someone, and he thought he had seen the person they were searching for (Tr. at 53).  He told Detective Colbert that he had called police earlier after seeing a black male, average height, average weight, dreadlocks, wearing a gray jacket, and that man had come up to

the witness's window (Tr. at 53). The witness saw the man go behind the vacant house at 321 North Peck (Tr. at 53, 54). After police had looked for the man and left, the witness saw the man come out of 321 North Peck, enter a green Cadillac driven by a white female, and leave the area (Tr. at 14, 39, 46, 53). Another witness on the same street told Detective Colbert she had seen a black man get into a green Cadillac (Tr. at 54).

9. The owner of the vacant home at 321 North Peck permitted police to enter the home with him (Tr. at 54). The man said there was no damage to the home, but there was a gray jacket and the back of a cell phone in the home that was not there the last time he had been in the home (Tr. at 54, 60).

10. Because of the reports that defendant left the area in a green four-door Cadillac being driven by a white female, officers were also looking for the Cadillac (Tr. at 14, 39, 46). An officer reported observing the Cadillac northbound on Lee's Summit Road past 23rd Street (Tr. at 14). Officer Seever was north of that location and saw the Cadillac at a stop light behind another car (Tr. at 14, 47). Detective Miller was in another marked police car and observed the green Cadillac at the red light, and it had what appeared to be a counterfeit, or homemade, temporary licence plate (Tr. at 47). Detective Miller had his lights and siren on, going southbound on Lee's Summit Road -- he had to pass a cement median and do a U-turn to pull in

Case 4:14-cr-00006-HFS   Document 34   Filed 11/14/14   Page 9 of 23

behind the Cadillac (Tr. at 47).  Detective Miller pulled up behind the Cadillac and got out of his patrol car as Officer Seever's patrol car entered Lee's Summit Road going in the wrong direction in an attempt to box in the Cadillac (Tr. at 14, 47). The driver pulled out, ran the red light, and hit the accelerator, reaching speeds of over 100 miles per hour on Lee's Summit Road (Tr. at 14, 48).  Officer Seever turned his car around and pursued the Cadillac, observing the driver speed through another lighted intersection at a very high rate of speed (Tr. at 15, 39, 48).  Detective Miller got back into his patrol car, advised Dispatch that the Cadillac was eluding police, and he pursued the car (Tr. at 48).  The driver was unable to make the sharp turn following the second intersection and slammed into a parked pickup truck (Tr. at 15, 39, 48).  The doors of the Cadillac flew open as if the occupants intended to flee; however, the impact was so strong that they were apparently unable to get out of the car quickly (Tr. at 15, 48).  The female driver and three black men exited the vehicle, and Officer Seever recognized defendant as one of them (Tr. at 15, 39).  Officer Seever recognized defendant without a doubt because defendant has gray eyes which the officer found distinctive (Tr. at 16).  The three men were taken into custody without incident (Tr. at 48-49).

11.  Officer Seever learned that defendant had an outstanding warrant for a parole violation for dangerous drugs

and another one for a misdemeanor from Pettis County (Tr. at 16).
He was placed under arrest (Tr. at 16).

12. At the police station, defendant was advised of his
Miranda rights (Tr. at 56). He read the Miranda waiver form out
loud, signed it, and agreed to speak to police (Tr. at 56).
Defendant initially denied having been in the Hawthorne complex
and encountering Officer Seever (Tr. at 56). He later admitted
that he ran from Officer Seever because he knew he had an
outstanding warrant (Tr. at 56). He said he had run behind a
house to get away from Officer Seever, but he did not admit
having gone into the house (Tr. at 59). He denied that he had a
weapon -- he leaned over in his chair and spoke quietly to
Detective Colbert and said, "That's feds for me" (Tr. at 56-57).
He indicated that Detective Colbert was trying to pin the gun on
him (Tr. at 59). Detective Colbert asked defendant for a DNA
sample to be collected through a swab of the inside of
defendant's cheek (Tr. at 60-61). Defendant agreed to give a DNA
sample, and said, "Ain't nobody sucking on no gun." (Tr. at 61).
Defendant admitted having been in the Cadillac and that he told
the driver to take a left to avoid the police because he had an
outstanding warrant (Tr. at 57, 58). He denied further
instructing the driver to elude police after his initial request
that she turn left (Tr. at 57).

11

### III. *<u>TERRY</u> STOP*

Generally, searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable, subject only to a few specifically established and well-delineated exceptions. <u>United States v. Harris</u>, 747 F.3d 1013, 1016 (8th Cir. 2014) (citing <u>Mincey v. Arizona</u>, 437 U.S. 385, 390 (1978)). One exception, first recognized in <u>Terry v. Ohio</u>, 392 U.S. 1, 30-31 (1968), permits an officer to stop and frisk an individual if the officer has a reasonable suspicion that "criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous."

#### A. *STOP*

The totality of the circumstances determines whether officers have reasonable suspicion to justify a stop. <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989). "Reasonable suspicion is a lower threshold than probable cause, and it requires considerably less than proof of wrongdoing by a preponderance of the evidence." <u>Williams v. Decker</u>, 767 F.3d 734, 739 (8th Cir. 2014) (internal citation omitted); <u>United States v. Carpenter</u>, 462 F.3d 981, 986 (8th Cir. 2006). A <u>Terry</u> stop typically is justified when a suspect matches the description of a person involved in a disturbance near in time and location to the stop. <u>United States v. Horton</u>, 611 F.3d 936, 940 (8th Cir. 2010).

12

Unprovoked flight at the sight of an officer can contribute to reasonable, articulable suspicion. United States v. Horton, 611 F.3d 936, 940 (8th Cir. 2010).

Defendant argues that Officer Seever lacked reasonable suspicion because defendant did not fit the description of the reported prowler. However, defendant was not stopped only because of his physical description.

Defendant had dreadlocks, he was of average height and build, he was in the age range as that reported by the witnesses, he was wearing a dark flat-billed cap, he was wearing jeans, and he was wearing a dark colored hoodie or jacket. Although this is not what would be characterized as a specific description of the suspect, it is a general description which fit defendant's appearance at the time he was first observed by Officer Seever. In addition, defendant was only a few hundred yards from the location of the attempted break-ins, and this was a short time after those incidents had been reported to police. Further, defendant stopped what he was doing and attempted to leave the scene quickly as soon as he saw Officer Seever's marked patrol car enter the parking lot. Defendant's matching the general description of the reported prowler, his location very close to the area of the reported attempted burglaries and a short time after those crimes were reported to police, and his attempt to leave the scene quickly immediately upon seeing Officer Seever

13

combined to create reasonable suspicion that defendant was the suspect. Therefore, Officer Seever was permitted to stop defendant to question him.

### B. PAT-DOWN SEARCH

The second prong of Terry v. Ohio permits the police officer to perform a pat-down search if he has reasonable suspicion that the person with whom he is dealing may be armed and presently dangerous. 392 U.S. at 30-31.

Officer Seever told defendant he wanted to talk to him. At that time, Officer Seever had no intent to search or arrest defendant. However, subsequent to the stop, defendant refused to give his name, he repeatedly attempted to reach into his clothing, he initially ignored multiple requests to sit down on the front stoop, and he tried to stand back up while Officer Seever tried to talk to him. Defendant continued to attempt to reach into his loose clothing despite Officer Seever's orders to stop, and defendant said, "You really need to help me," to another man on the scene while Officer Seever -- the only law enforcement officer present -- was attempting to talk to defendant.

The pertinent facts of this case are similar to those in United States v. Hayden, 759 F.3d 842 (8th Cir. 2014), petition for cert. filed October 15, 2014 (No. 14-6768). In that case, officers observed two men standing near a vacant house in a high-

14

crime area at 9:00 p.m. in late December.  The area had recently
suffered an increased number of burglaries and robberies
involving weapons.  Due to the actions of the two men, the
officers believed they may be planning to burglarize the house.
When the police approached the men to question them as to why
they were on the street late at night, Hayden turned away from
the officers (who were shining a flashlight in his direction) and
put his hand into his right jacket pocket.  The officers ordered
him to take his hand out of his pocket; and they performed a pat-
down search, locating a loaded revolver in the right jacket
pocket. In affirming the denial of the motion to suppress, the
Eighth Circuit held that the officers had reasonable suspicion to
believe that Hayden may be armed and presently dangerous.

> Hayden eventually was seized when he turned his body away
> from Officer Martorano, reached his hand into his jacket
> pocket, and complied with Martorano's command that he remove
> his hand from his pocket.  That seizure, however, was
> justified under the Fourth Amendment by reasonable suspicion
> that criminal activity was afoot.  See Terry v. Ohio, 392
> U.S. 1, 30 (1968).  The patrolling officers knew that there
> had been an increase in burglaries in the area.  It was late
> at night, and the officers knew from experience that it was
> unusual to find people on the street after dark in this
> high-crime area.  Hayden and Crockett appeared to be casing
> a house for a burglary. . . .  [A]s officers approached,
> Hayden turned away from the officers and put his hand into
> his pocket as though reaching for a weapon.  The totality of
> the circumstances gave the officers reasonable suspicion to
> conclude that a crime of burglary was in the offing.
> Consequently, the seizure of Hayden did not violate the
> Fourth Amendment, and the district court properly denied his
> motion to suppress the firearm obtained during the stop.

Id. at 847 (internal citation omitted).

In this case, officers knew that a prowler matching defendant's general description had attempted to break into several residences just a few hundred yards from where Officer Seever encountered defendant a short time later. Upon seeing Officer Seever, defendant quickly changed his course of action and attempted to get into a locked apartment by shouldering the door. He continued to "mess with" his baggy clothing despite Officer Seever instructing him to stop, and he had to be told several times to sit on the stoop before he complied. He refused to give his name when asked by the officer; he said, "You really need to help me," to another man who was present; and he tried to stand back up while Officer Seever was talking to him. Officer Seever had reasonable suspicion to believe that defendant was the man who had attempted to break into the nearby residences, and he had reasonable suspicion to believe that defendant may be attempting to reach or conceal a weapon while "messing with" his clothing.

In the course of a <u>Terry</u> stop, police officers may take steps reasonably necessary to protect their personal safety. <u>United States v. Harris</u>, 747 F.3d 1013, 1019 (8th Cir.), <u>cert</u>. <u>denied</u>, 135 S. Ct. 282 (2014); <u>United States v. Morgan</u>, 729 F.3d 1086, 1091 (8th Cir. 2013). They may go so far as to handcuff a suspect to protect their personal safety and maintain the status quo. <u>United States v. Harris</u>, 747 F.3d at 1019; <u>United States v.</u>

16

Smith, 645 F.3d 998, 1002 (8th Cir. 2011).  In this case, Officer Seever did not handcuff defendant; he attempted to perform a pat-down search based on defendant's actions which led Officer Seever to believe that defendant may have a weapon.

Therefore, had Officer Seever been able to conduct a pat-down search and had he discovered the firearm on defendant's person, the seizure of that firearm would have been permissible pursuant to Terry v. Ohio.  However, as the government points out, the firearm was not seized from defendant's person during this lawful Terry stop.

## IV.  FLEEING FROM POLICE

When Officer Seever attempted to perform a pat-down search, defendant spun around and struggled with Officer Seever before making a fist around an object.  Officer Seever tried to restrain defendant during the scuffle; but once he saw defendant appearing to grasp an object, he let defendant go and defendant fled the scene.  Officer Seever saw defendant throw a firearm into the grass a short distance from where the scuffle took place. Defendant admitted during his interrogation that he broke free of Officer Seever and ran from him; he did not admit having possessed or thrown down the gun which was not recovered from defendant but from the grass.

Even if defendant's argument that the Terry stop was not supported by reasonable suspicion had merit, the fact that he

17

struggled with Officer Seever and fled from him before the gun was seized makes the Terry argument irrelevant. Resistance to an illegal arrest can furnish grounds for a second, legitimate arrest. United States v. Schmidt, 403 F.3d 1009, 1016 (8th Cir. 2005); United States v. Dawdy, 46 F.3d 1427, 1430-1431 (8th Cir.), cert. denied, 516 U.S. 872 (1995). Accordingly, the Fourth Amendment does not bar evidence obtained after a defendant committed the new crime of resisting/fleeing from an officer.[1] "A contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." United States v. Schmidt, 403 F.3d at 1016, citing United States v. Bailey, 691 F.2d 1009, 1017 (11th Cir. 1982), cert. denied, 461 U.S. 933 (1983). Whether the defendant is charged with the new offense of resisting/fleeing from an officer does not matter to the Fourth Amendment question, so long as he could have been arrested for it as an objective matter. United States v. Schmidt, 403 F.3d at 1016.

---

[1] R.S. Mo. § 575.150.1(1) provides that a person commits the crime of resisting or interfering with arrest, detention, or stop if, knowing that a law enforcement officer is making an arrest, or attempting to lawfully detain or stop an individual or vehicle, or the person reasonably should know that a law enforcement officer is making an arrest or attempting to lawfully detain or lawfully stop an individual or vehicle, for the purpose of preventing the officer from effecting the arrest, stop or detention, the person resists the arrest, stop or detention of such person by using or threatening the use of violence or physical force or by fleeing from such officer.

In United States v. Sledge, 460 F.3d 963 (8th Cir. 2006), cert. denied, 549 U.S. 1297 (2007), an officer attempted to conduct a pat-down search, and Sledge resisted and attempted to flee.  The court held that "Sledge forfeited any Fourth Amendment protection by resisting and running away from the officers."  If the original pat-down search had uncovered evidence of a crime and the pat-down search had been illegal, the defendant, by attempting to flee, forfeited his right to challenge that illegal search.

Here, because defendant committed a new crime of resisting and fleeing from Officer Seever, even if the original Terry stop and attempted frisk were illegal, they would not provide a basis for suppressing the firearm.  Defendant's resisting Officer Seever's attempt to perform a pat-down search and defendant's fleeing from Officer Seever cost him his opportunity to challenge that Terry stop and frisk.

## V.   *ABANDONED PROPERTY*

It is well settled that a warrantless search of abandoned property does not constitute an unreasonable search and does not violate the Fourth Amendment.  Hester v. United States, 265 U.S. 57, 58 (1924).  The issue is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished his reasonable expectation of privacy.  United States v. Landry, 154 F.3d 897, 899 (8th Cir.

19

1998), <u>cert</u>. <u>denied</u>, 525 U.S. 1086 (1999); <u>United States v. Hoey</u>, 983 F.2d 890, 892 (8th Cir. 1993).  When a person abandons his property, his expectation of privacy in the property is so eroded that he no longer has standing to challenge a search of that property on Fourth Amendment grounds.  <u>United States v. Liu</u>, 180 F.3d 957, 960 (8th Cir. 1999); <u>United States v. Tugwell</u>, 125 F.3d 600, 602 (8th Cir. 1997), <u>cert</u>. <u>denied</u>, 522 U.S. 1061 (1998).

In determining whether property has been abandoned for Fourth Amendment purposes, the court must look to the totality of the circumstances, noting in particular two factors:  whether the suspect denied ownership of the property and whether he physically relinquished the property.  <u>United States v. Liu</u>, 180 F.3d at 960; <u>United States v. Landry</u>, 154 F.3d 897, 899 (8th Cir. 1998), <u>cert</u>. <u>denied</u>, 525 U.S. 1086 (1999).  Further, "[w]hether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent."  <u>United States v. Liu</u>, 180 F.3d at 960, quoting <u>United States v. Tugwell</u>, 125 F.3d at 602.

In <u>California v. Hodari D.</u>, 499 U.S. 621 (1991), the defendant ran upon seeing police approaching.  An officer chased the defendant and, when the defendant saw the officer almost upon him, he tossed away what appeared to be a small rock.  He was tackled by the officer and arrested.  The small rock was

recovered and found to be crack cocaine. The Court held that since the defendant had not been arrested at the time he threw the drugs, the drugs "were abandoned by Hodari and lawfully recovered by the police." Id. at 624.

In United States v. Simpson, 439 F.3d 490 (8th Cir. 2006), Simpson threw a rifle and magazines on the ground while being chased by police. "This act suffices to establish the evidence was physically relinquished. Further, the district court found, and we agree, that at the time Simpson discarded the rifle and magazines, he was attempting to disclaim ownership over this evidence so authorities could not trace the objects back to him." Id. at 494.

In United States v. Hollman, 541 F.2d 196, 199 n.8 (8th Cir. 1976), the Eighth Circuit found that when Hollman threw a packet of drugs from a car as the police approached him, he had abandoned the evidence and therefore had no protectable Fourth Amendment interests in the drugs.

Here, defendant fled from Officer Seever and he threw the firearm while fleeing. He clearly physically relinquished the gun and was attempting, at the time he threw it, to disclaim ownership over the gun so that it could not be traced back to him. Further, during his interrogation he denied ownership of or ever having possessed the gun. As a result, defendant has no protectable Fourth Amendment interest in the gun.

21

## VI. CONCLUSION

Based on all of the above, I find that (1) the initial stop of defendant was a proper Terry stop as it was supported by reasonable suspicion that defendant was the man who had attempted to commit several burglaries, (2) the attempted pat-down search was proper because Officer Seever had reasonable suspicion that defendant may be armed and presently dangerous, (3) defendant's resisting and fleeing from Officer Seever makes irrelevant any Terry issue that occurred prior to that resisting and fleeing, and (4) because defendant abandoned the gun and disclaimed any interest in it during his interrogation, he has no Fourth Amendment interest in the gun.

Defendant additionally sought suppression of his statement only on the ground that it was the fruit of his illegal stop (Tr. at 64). Because I find that there have been no violations of defendant's constitutional rights, there is no basis for suppressing his statement.

It is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress.

22

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 14, 2014

Case 4:14-cr-00006-HFS   Document 34   Filed 11/14/14   Page 23 of 23